Filed 6/5/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | | |
|---|---|---|---|
| WILLIAMS & FICKETT, | ) | | |
| | ) | | |
| Plaintiff and Appellant, | ) | | |
| | ) | S224476 | |
| v. | ) | | |
| | ) | Ct.App. 5 F068652 | |
| COUNTY OF FRESNO, | ) | | |
| | ) | Fresno County | |
| Defendant and Respondent. | ) | Super. Ct. No. 13CECG00461 | |
| _____ | ) | | |

As a general rule, a party must exhaust available administrative remedies as a prerequisite to seeking relief in the courts. "In the property tax context, application of the exhaustion principle means that a taxpayer ordinarily may not file or pursue a court action for a tax refund without first applying to the local board of equalization for assessment reduction under [Revenue and Taxation Code] section 1603 and filing an administrative tax refund claim under section 5097."[1] (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1308, italics omitted (*Steinhart*).) Our case law has recognized an exception to this general rubric where a tax assessment is "a nullity as a matter of law." (*Stenocord v. San Francisco* (1970) 2 Cal.3d 984, 987 (*Stenocord*).) This case presents the question of whether the nullity exception applies, so that a timely assessment appeal is not required as a first step in the exhaustion process, when an assessment on

---

[1] All further statutory citations are to the Revenue and Taxation Code.

**SEE CONCURRING & DISSENTING OPINION**

nonexempt property is challenged on the ground that the taxpayer does not own the property involved.

We conclude that in this scenario, the taxpayer must seek an assessment reduction through the assessment appeal process before the county board of equalization or a county assessment appeals board (county board), or obtain a stipulation under section 5142, subdivision (b) that such proceedings are unnecessary, in order to maintain a postpayment superior court action under section 5140 that seeks reduction of the tax. To the extent that our decision in *Parr-Richmond Industrial Corp. v. Boyd* (1954) 43 Cal.2d 157 (*Parr-Richmond*) provides otherwise, we conclude that it has been overtaken by intervening developments in the law, and overrule it. However, because plaintiff and others in its position could reasonably have relied on *Parr-Richmond* in opting not to pursue timely assessment appeal proceedings under section 1603, we give our ruling prospective effect only. We therefore affirm the judgment of the Court of Appeal.

## I. FACTS AND PROCEDURAL BACKGROUND

This is a tax refund action brought by plaintiff Williams & Fickett against defendant County of Fresno (County). Because this case is before us after the trial court sustained defendant's demurrer without leave to amend, we take the facts as stated in the operative complaint and its attachments to be true. (*Steinhart*, *supra*, 47 Cal.4th at p. 1304, fn. 1.) Plaintiff is a general partnership engaged in the business of farming in Fresno County. In 1997, the County's Office of the Assessor-Recorder conducted an audit of plaintiff. That audit eventually led to escape assessments[2] for the tax years 1994 through 1997 and assessments for the

---

[2] An escape assessment is a retroactive assessment for years in which property was either not assessed or underassessed. (See § 531 et seq.)

tax years 1996 through 2001, based on the assertion that plaintiff owned certain farming equipment that was not reported, or was incorrectly reported, on its personal property statements.  In 1997, when the County first gave notice of the escape assessments, it informed plaintiff that if plaintiff wished to challenge the assessments, it had 60 days from the date of the notice to apply to the County's assessment appeals board for assessment reductions under section 1603.  On the relevant lien dates, however, plaintiff did not own the farm equipment that was the subject of the assessments, and plaintiff neither paid the assessed taxes nor applied for assessment reductions under section 1603 within the 60-day period.  The County then recorded certificates of delinquency related to the unpaid tax assessments, resulting in liens on plaintiff's real and personal property.

In 2003, the County audited plaintiff's property tax declaration for the 2001 tax year.  At that time, the County found an overassessment and gave plaintiff a refund for the 2001 tax year.  The County declined, however, to grant refunds for previous tax years.  In 2006, the County again audited plaintiff, and it again found an overassessment, giving plaintiff refunds for the tax years 2002 through 2005.

Shortly after the 2006 audit, plaintiff hoped to refinance certain property, and it sought to clear the tax liens that encumbered that property.  Plaintiff's attorney wrote to the County's auditor-controller, explaining:  "From 1996 to the current date, Fresno County has erroneously assessed personal property taxes against my clients.  For whatever reason, prior auditors felt that my clients and their secured creditors were lying when they presented evidence that a substantial portion of their personal property was seized as a result of their bankruptcy filings during 1997.  This proof, rejected by the prior auditor, was accepted during the most recent [2006] audit . . . . [¶] . . . Since the property was returned to various secured creditors in 1997, the County lien, which appears to date back to 1996,

3

must be significantly reduced[,] as were the 2002-2005 taxes." The County declined to reduce the liens.

On June 13, 2007, plaintiff attempted to apply to the assessment appeals board for cancellation of the disputed assessments. These applications were submitted to the clerk of the board of supervisors using the County's printed form for applying for assessment reductions under section 1603.[3] That form includes a catchall option stating: "If you are uncertain of which item to check [regarding the basis of your application], please check 'I. OTHER' and attach two copies of a brief explanation of your reason(s) for filing this application." Plaintiff's attorney checked that catchall option on each of the applications and attached a statement saying, "This application is based upon Revenue and Taxation Code § 4986."[4] The attachment further explained that as of the lien date, plaintiff was not the owner of most of the property being taxed. The County returned the applications unfiled, taking the view that they were untimely applications for assessment reductions under section 1603.

About three years later, on November 24, 2010, plaintiff filed a complaint for declaratory relief against the County, asserting that the farm equipment in question had been "sold or returned to secured creditors," and therefore that the

---

[3]    For the 1994 escape assessment, plaintiff sought a reduction from $1,352,560 to $238,794; for the 1995 escape assessment, a reduction from $1,032,680 to $238,794; for the 1996 escape assessment, a reduction from $496,660 to $0; for the 1997 escape assessment, a reduction from $300,190 to $0; for the 1996-1997 tax year assessment, a reduction from $1,170,290 to $238,794; and for the 1997-1998, 1998-1999, 1999-2000, and 2000-2001 tax year assessments, a reduction from $1,170,290 to $169,259.

[4]    Section 4986 authorizes the county auditor to cancel "[a]ll or any portion of any tax, penalty, or costs" if, among other things, it was levied erroneously or illegally, or if it was levied on property that did not exist as of the lien date.

assessments related to the equipment should be cancelled. The trial court sustained a demurrer to the complaint, concluding that the complaint sought to enjoin the collection of property taxes, which is prohibited by both the state Constitution and state law (see Cal. Const., art. XIII, § 32; see also § 4807).

In 2012, plaintiff paid the disputed taxes, including interest and penalties, and it then filed administrative refund claims under section 5097. The County denied those claims.

Finally, in 2013, plaintiff initiated this action under section 5140, seeking to recover the taxes that it had paid. The superior court sustained the County's demurrer on the ground that plaintiff had failed to exhaust its administrative remedies by not filing timely applications for reduction of the challenged assessments under section 1603, subdivision (a). The Court of Appeal reversed, concluding that "where, as here, the taxpayer claims [an] assessment is void because the taxpayer does not own the [assessed] property, the taxpayer is not required to apply for an assessment reduction under section 1603, subdivision (a), to exhaust its administrative remedies." We granted review.

## II. DISCUSSION

According to plaintiff, a taxpayer that asserts it does not own nonexempt assessed property need not first file and prosecute an assessment appeal under section 1603 et seq. in order to later pursue a refund action (see § 5140) after filing an administrative tax refund claim (see § 5097). As we will explain, against a backdrop of the general rule that requires the exhaustion of adequate administrative remedies, the statutory scheme for assessment appeals evinces the Legislature's intent that disputes such as the one at bar be presented, in the first instance, to a county board through the assessment appeal process. When a taxpayer seeks a reduction in an assessment on the local roll on the ground that it does not own the assessed property, the assessor and county board may agree with

5

the taxpayer that the matter involves only a nonvaluation question; by statute, a stipulation to this effect will satisfy the exhaustion requirement of an assessment appeal. Otherwise, an assessment appeal must be pursued to resolution before the county board to preserve the taxpayer's right to later bring a refund action after payment of the tax. This design advances the salutary purposes served by the exhaustion requirement, while also allowing for expedited presentation of disputes to the courts in situations where, to all involved, a matter does not implicate the core of a county board's expertise.

## A. Exhaustion of Administrative Remedies

The rule requiring exhaustion of administrative remedies is well settled. "In general, a party must exhaust administrative remedies before resorting to the courts. [Citations.] Under this rule, an administrative remedy is exhausted only upon 'termination of all available, nonduplicative administrative review procedures.' [Citations.]" (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080 (*Coachella Valley*); see also *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292-293.)

The exhaustion rule " 'is not a matter of judicial discretion, but is a fundamental rule of procedure . . . binding upon all courts.' " (*Campbell v. Regents of the University of California* (2005) 35 Cal.4th 311, 321 (*Campbell*).) We have explained that "[t]he exhaustion doctrine is principally grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary). [Citations]." (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 391; see also *Rojo v. Kliger* (1990) 52

6

Cal.3d 65, 83 [explaining that the exhaustion doctrine advances policy interests such as "easing the burden on the court system, maximizing the use of administrative agency expertise and capability to order and monitor corrective measures, and providing a more economical and less formal means of resolving [a] dispute"]; *Yamaha Motor Corp. v. Superior Court* (1986) 185 Cal.App.3d 1232, 1240 [observing that the exhaustion doctrine " 'facilitates the development of a complete record that draws on administrative expertise' " and affords "a preliminary administrative sifting process [citation], unearthing the relevant evidence and providing a record which the court may review"].)

As previously observed, "In the property tax context, application of the exhaustion principle means that a taxpayer ordinarily may not file or pursue a court action for a tax refund without first applying to the local board of equalization for assessment reduction under section 1603 and filing an administrative tax refund claim under section 5097." (*Steinhart*, *supra*, 47 Cal.4th at p. 1308, italics omitted.) As plaintiff recognizes, it has long been held that taxpayers that claim that their property has been overvalued must exhaust the assessment appeal administrative remedy before resorting to the courts. (See, e.g., *Dawson v. County of Los Angeles* (1940) 15 Cal.2d 77, 81; *Luce v. City of San Diego* (1926) 198 Cal. 405, 406-407.) Plaintiff asserts, however, that this principle does not apply here, because its assertion of nonownership means that "there is no question of valuation involved which requires the local board[']s . . . expertise, and the board has no function to perform."

## B. The Statutory Scheme for Assessment Appeals

In evaluating this argument, we begin with the statutory scheme for assessment appeals. Pursuant to section 1603, "[a] reduction in an assessment on the local roll shall not be made unless the party affected or his or her agent makes

7

and files with the county board a verified, written application showing the facts claimed to require the reduction and the applicant's opinion of the full value of the property." (§ 1603, subd. (a).)[5] These appeals are then resolved through a process that can involve a public hearing (§§ 1605.4, 1605.6), exchanges of information (§ 1606), examinations under oath (§ 1607), and the collection and introduction of additional evidence in support or refutation of an appeal (§§ 1609, 1609.4, 1609.5, 1610.2). Ultimately, "the county board shall equalize the assessment of property on the local roll by determining the full value of an individual property, by assessing any taxable property that has escaped assessment, correcting the amount, number, quantity, or description of property on the local roll, canceling improper assessments, and by reducing or increasing an individual assessment . . . ." (§ 1610.8; see also § 1605, subd. (e).)

The statutory procedures associated with assessment appeals connote that the central responsibility of county boards is to decide questions of valuation. (E.g., § 1603, subd. (a).) But when a party seeks a reduction in an assessment on the local roll, pure questions of valuation are often inextricably connected to related issues of fact, such as whether a change in ownership has occurred, whether property has been properly classified, and whether a taxpayer in fact owns assessed property.[6]

---

[5]     A "county board" means "a county board of supervisors meeting as a county board of equalization or an assessment appeals board." (§ 1601, subd. (a).)

[6]     In his concurring and dissenting opinion, Justice Chin asserts that county boards lack jurisdiction to decide claims of nonownership such as the one raised here. (See conc. & dis. opn. of Chin, J., *post*, at pp. 8, 14.) But this view fails to fully appreciate that a county board may need to decide certain threshold facts in the proper exercise of the equalization function, and that it lies within the authority of these bodies to make these decisions. (See Cal. Const., art. XIII, § 16; § 5142, subd. (c).) Questions regarding a change in ownership are *among* these issues, but

*(Footnote continued on next page.)*

The statutory scheme recognizes the authority of the county boards to decide these issues. Particularly pertinent here are changes to and clarifications of the assessment appeal scheme that have occurred since 1978, the year in which the electorate passed Proposition 13. That measure "generally limits the maximum amount of any ad valorem tax on real property to 1 percent of its 'full cash value.' (Cal. Const., art. XIII A, § 1, subd. (a).)" (*Auerbach v. Assessment Appeals Bd. No. 1* (2006) 39 Cal.4th 153, 160.) Full cash value means "the county assessor's valuation of the property on the 1975-1976 tax bill 'or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment.' ([Cal. Const., art. XIII A], § 2, subd. (a) . . . .)" (*Ibid*., italics omitted.)

Proposition 13 thus connected property valuation with a nonvaluation question, i.e., whether a change in ownership has occurred. Initially, there was

---

*(Footnote continued from previous page.)*

they do not represent the only factual determination that, although it does not strictly concern the specific value that may be attached to property, nonetheless may be pertinent — even essential — to the fulfillment of a county board's basic equalization duties. Indeed, the concurring and dissenting opinion's overly circumscribed view of the jurisdiction of county boards would seem to call into question these entities' ability to decide a bevy of threshold factual questions that are implicit in any assessment.

Furthermore, to the extent that the concurring and dissenting opinion premises its jurisdictional analysis on a belief that a party in plaintiff's position is not seeking, at root, a "reduction in an assessment" on the local roll (§ 1603, subd. (a)) within the meaning accorded this phrase within the statutory scheme (see conc. & dis. opn. of Chin, J., *post*, at pp. 3-7, 10-11), we disagree with this view, as well. Contrary to the assertions in the concurring and dissenting opinion, from the perspective of an individual taxpayer it makes perfect sense to seek a reduction in an assessment on the ground that one does not own the property that has been assessed. And in fact, that is substantively what plaintiff sought to do, albeit styling its application as one seeking cancellation of a tax under section 4986.

some doubt whether change in ownership issues lay within the purview of county boards, as part of the assessment appeal function. In 1986, the Legislature dispelled this uncertainty by adding section 1605.5, subdivision (a)(1), which provides that "[t]he county board shall hear applications for a reduction in an assessment in cases in which the issue is whether or not property has been subject to a change in ownership . . . or has been newly constructed . . . ." (Added by Stats. 1986, ch. 1457, § 21, p. 5232.)[7] *Steinhart*, *supra*, 47 Cal.4th 1298, elaborated on the rationale behind this provision. There, we observed that "[i]n detailing the purpose of this section, the relevant legislative history explained: 'The law is [currently] unclear if taxpayers can appeal the issue of whether or not there has been a change [in] ownership to either [a county board of equalization or an assessment appeals board]. [¶] This provision requires county boards of equalization and assessment appeals boards to hear change [in] ownership issues.' (Assem. Com. on Revenue & Taxation, Analysis of Assem. Bill No. 2890 (1985-1986 Reg. Sess.) as amended Mar. 19, 1986, p. 7.) Thus, section 1605.5, subdivision (a), expressly vests county boards with 'jurisdiction . . . to adjudicate change [in] ownership disputes' between assessors and taxpayers and 'contemplates' that such disputes will 'be resolved by the local appeals board before resort is made to the courts.' [Citation.]" (*Steinhart*, at p. 1311, fn. and underscoring omitted.)

Seven years later, the Legislature amended section 5142 to affirm that county boards have "jurisdiction over nonvaluation issues" (§ 5142, subd. (c)), while simultaneously adding a procedure that allows parties to avoid the

---

[7] In this context, "[a] 'change in ownership' means a transfer of a present interest in *real* property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." (§ 60, italics added.)

10

assessment appeal process if they and "the assessor stipulate that an application involves only nonvaluation issues," a stipulation to this effect is filed with the county board, and the county board accepts this stipulation (*id*., subd. (b)). The county board's acceptance of the stipulation "shall be deemed compliance with the requirement that the person affected file and prosecute an application for reduction under Chapter 1 (commencing with Section 1601) of Part 3 in order to exhaust administrative remedies." (*Ibid*.)

Thus, although we have inferred an exhaustion requirement even within statutory schemes that " 'do not make exhaustion of the [administrative] remedy a condition of the right to resort to the courts' " (*Flores v. Los Angeles Turf Club, Inc.* (1961) 55 Cal.2d 736, 747), here the relevant statutes provide affirmative indications of the Legislature's desire that claims such as plaintiff's be submitted to a local board through the assessment appeal process in the first instance as a prerequisite to later maintaining a refund action under section 5140. Although a taxpayer's contention that it does not own nonexempt property subject to an assessment arguably raises a nonvaluation issue,[8] the stipulation procedure

_____

**8**     It is not always obvious when a dispute poses a valuation question and when it does not. (Compare, e.g., *El Tejon Cattle Co. v. County of San Diego* (1967) 252 Cal.App.2d 449 [regarding a dispute concerning the number of head of livestock to be assessed as presenting a valuation issue] and *Montgomery Ward & Co. v. Welch* (1936) 17 Cal.App.2d 127, 133-134 [treating a claim that the local tax authority substantially overassessed warehouse inventory as presenting a question of valuation] with *Associated Oil Co. v. County of Orange* (1935) 4 Cal.App.2d 5, 9 (*Associated Oil*) [concluding that exhaustion before the county board was not required for a claim that the taxpayer had been assessed for 486,096 barrels of oil, when it had produced only 126,132 barrels of oil]; see also Oeser, *Equalization and Cal. Property Tax Exemptions* (1972) 5 U.C. Davis L.Rev. 213, 223-224 [discussing the difficulties associated with distinguishing between valuation issues and nonvaluation issues].) The challenges associated with line drawing in this context provide additional justification for providing county boards with an opportunity to assess whether a matter involves only nonvaluation issues,

*(Footnote continued on next page.)*

11

bespeaks a legislative determination that the county board should, in the first instance, pass on this question, or decide that it need not do so. Indeed, the whole stipulation process — part of a "carefully crafted statutory scheme the Legislature has, within its constitutional authority, put in place" (*Steinhart*, *supra*, 47 Cal.4th at pp. 1312-1313, italics omitted) — would be meaningless, and section 5142, subdivision (b) would be surplusage, if an exhaustion requirement did not apply to nonvaluation issues.[9] If that were true, there would be no need for a taxpayer to

*(Footnote continued from previous page.)*

through the stipulation procedure at section 5142, subdivision (b), before a litigant may resort to the courts. (Cf. *Coachella Valley*, *supra*, 35 Cal.4th at p. 1082 [advancing a three-factor test used to decide claims that an agency lacks jurisdiction, when presented as a rationale to excuse exhaustion].)

[9]      Plaintiff asserts that section 5142, subdivision (b) applies only to "taxpayers who are required by section 1605.5 to apply for reduction in assessment because their dispute involves a *change in ownership* issue." The language of section 5142, subdivision (b), as related in the text, does not admit of this limitation. Nor, as explained below, does the legislative history of the statute (Stats. 1993, ch. 387, p. 2214 et seq.) that codified the stipulation procedure.

As plaintiff observes, in the legislative session before the one in which the stipulation procedure was enacted, a measure was considered that would have specified that pursuit of an administrative appeal was *not* necessary to exhaust administrative remedies for change in ownership disputes. (Sen. Bill No. 1557 (1991-1992 Reg. Sess.) as amended July 30, 1992, § 5 (Senate Bill No. 1557).) This measure failed to pass. (*Steinhart*, *supra*, 47 Cal.4th at p. 1312.)

Enacted in the next legislative session, the Morgan Property Taxpayers' Bill of Rights (Sen. Bill No. 143 (1993-1994 Reg. Sess.) (Senate Bill No. 143)) codified section 5142, subdivision (b)'s stipulation procedure and an accompanying affirmation of the generally applicable exhaustion requirement, which appears at section 5142, subdivision (c). (Stats. 1993, ch. 387, § 8, p. 2218.) The legislative history for *this* measure does not manifest an intent that the stipulation process would apply only to change in ownership disputes. On the contrary, the pertinent discussions of this provision within legislative materials speak in more general terms. (E.g., Sen. Revenue & Taxation Com., analysis of Sen. Bill No. 143 (1993-1994 Reg. Sess.), as introduced Jan. 28, 1993, p. 4 ["Currently a taxpayer may not file a refund claim in court until administrative

*(Footnote continued on next page.)*

seek a stipulation in order to obtain judicial review of a challenge to an assessment when the dispute did not involve a valuation issue.

Application of the exhaustion rule to the circumstances present here also advances the purposes served by the exhaustion of administrative remedies requirement in general. A challenge brought on the ground of nonownership of assessed property will typically entail a question of fact, as to which administrative exhaustion through the assessment appeal process would facilitate the development of a record conducive to judicial review. The parties also might resolve their disagreement over ownership through the administrative process. Such an outcome could eliminate the need to pay the tax under dispute and bring a refund action, and thereby lessen the burden on the courts. Recognizing an assessment appeal as subsumed within the exhaustion requirement also supplies a timeline for the presentation and resolution of disputes such as this one. There is a

_____

*(Footnote continued from previous page.)*

remedies have been exhausted by filing and pursuing an appeal before the county assessment appeals board. SB 143 would add a provision permitting the taxpayer and the assessor to stipulate as to the lack of a question of value within a dispute. The stipulation would satisfy the requirement of filing an application for reduction, thus exhausting administrative remedies, as required, before going to court."].)

Plaintiff asserts that the Legislature did not intend for the stipulation procedure enacted in 1993 to reach any further than the change in ownership disputes that were the subject of Senate Bill No. 1557. But regardless of the intentions that informed Senate Bill No. 1557, the Legislature's *ultimate* decision not to adopt language that would expressly or implicitly limit stipulations under section 5142, subdivision (b) to change in ownership disputes, together with the lack of indications within the legislative history of Senate Bill No. 143 that the Legislature intended such a restriction, establish that the measure cannot be limited in the manner plaintiff describes. (See *Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1155 [giving similarly limited weight to the legislative history of an earlier, unsuccessful measure].)

13

time frame defined by statute for bringing and resolving an assessment appeal through administrative channels. (§§ 1603, subds. (b)-(d), 1604, 1605, subds. (b)-(e).) But no comparable deadline exists when the nullity exception applies. Where exhaustion is excused, therefore, the predictable result is stale claims like the one before the court in this case. The passage of time can make these claims difficult to adjudicate; it also hinders counties' ability to predict and budget for revenue.

Plaintiff's efforts to reconcile its failure to exhaust administrative remedies with the statutory scheme, meanwhile, are unconvincing. Its arguments primarily concern the perceived inability of a party in its position to complete the application for reduction prescribed under section 1603. First, plaintiff asserts that a taxpayer that does not have a taxable connection to property[10] cannot fulfill section 1603, subdivision (a)'s requirement that an application seeking a reduction in an assessment include "the applicant's opinion of the full value of the property." The inference plaintiff draws from this alleged roadblock is that a taxpayer that disclaims such a connection is neither required nor even permitted to file such an application. This reading of section 1603, subdivision (a) also informs plaintiff's construction of other aspects of the framework for assessment appeals. For example, plaintiff asserts that section 5142, subdivision (b)'s stipulation procedure applies only to those parties already required to file an application under section 1603, which (according to plaintiff), it did not have to do.

We disagree with this construction of section 1603, subdivision (a). Although the language discussed above may reflect the reality that most

---

[10] Under section 405, subdivision (a), "the assessor shall assess all the taxable property in his county, except state-assessed property, to the persons owning, claiming, possessing, or controlling it on the lien date."

14

assessment appeals involve what are by any measure valuation disputes, the requirement that the applicant venture an "opinion of the full value of the property" (§ 1603, subd. (a)) does not in practice interpose an insuperable obstacle to an administrative appeal of an assessment when a lack of ownership is asserted, and we doubt that the Legislature intended it as such. An applicant that disputes the ownership of assessed property nonetheless might have an informed opinion about the property's value. Also, where an applicant asserts that it does not own some or all of the personal property that has been grouped within a single assessment, the applicant could provide its estimate of the value of the specific pieces of property, if any, it concedes it owns (as plaintiff appears to have done in its 2007 applications). In a worst case scenario, an applicant that claims not to own property might opine that the true value is unknown, and explain why. A stipulation filed under section 5142, subdivision (b) must "[*t*]*o the extent possible* . . . indicate the parties' agreement as to the assessment amounts that would result under their respective positions on the issue or issues in dispute." (Italics added.) Because "[t]he law never requires impossibilities" (Civ. Code, § 3531), a similar allowance presumably applies to applications under section 1603, subdivision (a).

Plaintiff also argues that because it disclaims ownership of the property subject to assessment, it (and others in the same position) cannot execute the certification required under section 1603, subdivision (f). This certification provides, in relevant part, "I certify (or declare) under penalty of perjury under the laws of the State of California that . . . I am (1) the owner of the property or the person affected (i.e., a person having a direct economic interest in the payment of the taxes on that property — 'The Applicant[.]' " (See also Cal. Code Regs., tit. 18, § 301, subd. (g) [similarly defining a " 'person affected' or 'party affected' " as "any person or entity having a direct economic interest in the payment of

15

property taxes on the property for the valuation date that is the subject of the proceedings . . .".) Yet regardless of its contention that it does not own the property involved, plaintiff *is* a "person affected." Having been identified by the County as the party responsible for the tax, it has a "direct economic interest in the payment of taxes on [the] property." Plaintiff, and others in its position, therefore can execute this certification with a clear conscience.[11]

### C. The Nullity Exception and *Parr-Richmond*

Given that requiring plaintiff to exhaust the administrative remedy provided by the assessment appeals process would comport with the statutory scheme and advance the general purposes served by the exhaustion rule, this would be an easy case but for our decision in *Parr-Richmond*, *supra*, 43 Cal.2d 157.

"The doctrine requiring exhaustion of administrative remedies is subject to exceptions." (*Coachella Valley*, *supra*, 35 Cal.4th at p. 1080.) "These exceptions are flexible." (*Campbell*, *supra*, 35 Cal.4th at p. 322.) Departures from the general rule that demands exhaustion therefore are recognized in situations such as "when the administrative agency cannot provide an adequate remedy" and "when the subject of [a] controversy lies outside the agency's jurisdiction." (*Ibid.*)

This case does not implicate any of the generally applicable exceptions to the general exhaustion rule, however. The assessment appeal process *does* offer an adequate administrative remedy to a party that claims it was taxed for

---

[11] Although a taxpayer is charged with knowledge of the law, clear notice regarding both the need to exhaust administrative remedies and the avenues that exist for doing so will reduce the chance that the taxpayer will inadvertently violate the law. Therefore, it is advisable for a county to inform a taxpayer in relevant notices and forms not only of the need to exhaust administrative remedies through an application for an assessment reduction under section 1603, but also of the prospect of a stipulation under section 5142, subdivision (b) when a nonvaluation issue provides the basis of the taxpayer's challenge.

16

nonexempt property it did not own. And the statutory scheme's incorporation of provisions that expressly or implicitly recognize that county boards have authority to rule on nonvaluation questions in connection with an application seeking a reduction in assessment on the local roll forecloses any argument that these bodies lack jurisdiction over these issues.

The nullity exception is instead specific to tax disputes. We have described this judicially designed rule as follows: "Ordinarily a taxpayer seeking relief from an erroneous assessment must exhaust available administrative remedies before resorting to the courts. [Citations.] An exception is made when the assessment is a nullity as a matter of law because, for example, the property is tax exempt, nonexistent or outside the jurisdiction [citations], and no factual questions exist regarding the valuation of the property which, upon review of the board of equalization, might be resolved in the taxpayer's favor, thereby making further litigation unnecessary [citations]." (*Stenocord*, *supra*, 2 Cal.3d at p. 987.)

*Parr-Richmond*, *supra*, 43 Cal.2d 157, applied this exception to situations "where the taxpayer attacks the assessment as void because he does not own the property on which the tax demand was made, there is no question of valuation which must be presented first to the board of equalization for correction as a condition for judicial relief." (*Id*., at p. 165.) As we explain, insofar as *Parr-Richmond* excused a failure to present a claim of nonownership of nonexempt property for review through the assessment appeal process, we believe it has been overtaken by developments in the statutory scheme for assessment appeals.

Prior to *Parr-Richmond*, this court had been circumspect about recognizing any exception to the already longstanding rule requiring exhaustion of administrative remedies (see *Fall v. City of Marysville* (1861) 19 Cal. 391, 393) in situations where a taxpayer asserted nonownership of assessed property. *Henne v. Los Angeles County* (1900) 129 Cal. 297, 299, flatly rejected such an exception,

17

endorsing instead the principle that " 'great mischiefs would follow if we were to hold that an excess of valuation would render an assessment illegal and void. And it is immaterial whether the excess is caused by including in the valuation property of which the person taxed is not the owner, or that for which he is not liable to be taxed. In both cases the remedy is the same. . . . His only remedy is application for abatement.' " (Quoting *Osborn v. Danvers* (Mass. 1827) 6 Pick. 98, 100.)

In 1911, however, *Brenner v. Los Angeles* (1911) 160 Cal. 72 (*Brenner*) *partially* repudiated this view. The court in *Brenner* announced that "we are of the opinion that, in so far as *Henne v. County of Los Angeles* places in the same category the mere over-valuation of property in an assessment thereof, and the inclusion in such an assessment of property *not taxable at all*, that case should be overruled." (*Id*., at p. 76, italics added.) In *Brenner*, an assessment of real property did not deduct from the valuation the amount of a mortgage owned by the University of California, which was exempt from taxation. (*Id*., at pp. 73, 79.) The taxpayer "had no notice of the assessor's error until long after the possibility of seeking relief from the board of equalization had passed." (*Id*., at p. 75.) *Brenner* held that under the circumstances presented, the taxpayer's failure to seek relief from the board of equalization did not bar the filing of a refund action. The court resolved, "it is time to renounce the doctrine that money paid under protest for taxes *on property not liable to assessment* cannot be recovered unless application is made for correction of the assessor's error before the period of equalization fixed by law has passed." (*Id*., at p. 76, italics added.) In summing up the consequences of its affirmance of the judgment below, *Brenner* reiterated that "[b]y the judgment of the superior court herein the city of Los Angeles lost not a cent of taxes rightfully due upon plaintiff's property, while upon the opposite conclusion, plaintiff would be muleted, not for taxes due from some one else

18

which through error or carelessness he had paid, *but for a charge upon property free from any legitimate assessment by the city at all*." (*Id*., at p. 80, italics added.)

*Brenner*, the principal wellspring of the nullity doctrine, is therefore distinguishable in two respects from this case: It involved a taxpayer who had no knowledge of the factual basis for his assessment dispute until after the window for challenging the assessment had closed, and the assessment was imposed on exempt property beyond the authority of the local board to tax, i.e., property that was "not taxable at all" and "not liable to assessment." (*Brenner*, *supra*, 160 Cal. at p. 76.) Here, it is not asserted that the farm equipment that is the subject of the dispute is "not taxable at all." Instead, the question is who should pay the tax. This difference matters because it affects the policy considerations that, in turn, inform construction of the exhaustion doctrine. Property that is exempt as a matter of law lies beyond the power of a local government to tax *at any time*. By contrast, had plaintiff timely presented and pursued an assessment appeal and established that it was not the owner of this equipment, the County could have identified the actual owner and imposed escape assessments on it, instead. Now it would be too late. (See § 532, subds. (a), (b) [relating the standard deadlines for imposition of escape assessments].)

*Security-First Nat. Bk. v. County of L.A.* (1950) 35 Cal.2d 319 confirmed that the exception to the exhaustion requirement that we recognized in *Brenner*, *supra*, 160 Cal. 72, was both informed and limited by public policy considerations. In *Security-First*, this court held that a bare assertion that property was exempt from taxation would not justify a failure to exhaust administrative remedies. As *Brenner* had, *Security-First* premised its exhaustion analysis on whether the property associated with the allegedly improper assessment lay beyond the legal authority of the board to tax. The taxpayer in *Security-First* asserted that it was not required to exhaust administrative remedies prior to filing suit to challenge an

19

assessment imposed on its bank vault doors and counterlines, because these fixtures were " 'exempt' from taxation under constitutional principles." (*Security-First*, at p. 321.) After recognizing what it described as the "nullity" exception to the general exhaustion requirement, the *Security-First* court rejected this effort to expand the *Brenner* rule, explaining that "[t]he vault doors and counterlines admittedly were located within the county, city and district in which they were assessed. Clearly, they were property of a nature taxable by defendants. [Citation.] The fact that similar property of others had been systematically misclassified as personalty and therefore relieved of the burden of special assessment district taxes would ordinarily require that plaintiff also be excused from paying such taxes. [Citation.] It does not follow, however, that plaintiff's vault doors and counterlines were tax exempt as claimed." (*Security-First*, at p. 321.) The court continued, "although plaintiff would have been entitled to recover a discriminatory tax upon its vault doors and counterlines, such property was nevertheless taxable. In fact, the board of equalization could have eliminated the discrimination by directing the assessor to enter the misclassified fixtures owned by others as real property upon the assessment roll [citation], in which case plaintiff would not be excused from paying, or entitled to recover, the special district taxes. *Plaintiff's failure to make timely application for relief before the board precluded the adoption of that means of equalization.*" (*Id*., at p. 322, italics added.) *Security-First* thus emphasized the consequences that avoiding exhaustion had not only for the taxpayer, but also for local government and its collection of revenue.

*Parr-Richmond*, *supra*, 43 Cal.2d 157, also involved a taxpayer's claim that property was exempt from taxation. There, the plaintiff brought two actions to recover taxes paid under protest. The gist of the plaintiff's claim was that it had been taxed as if it was the owner of a fee interest in two parcels of real property,

20

when in fact at the relevant times it had only a " 'qualified and contingent possessory interest' " in the property. (*Id*., at p. 159.) The true owner, according to the plaintiff, was the federal government, which had not yet transferred title to it. (*Id*., at p. 160.) As was true in *Brenner*, the government's fee interest in *Parr-Richmond* would have been tax exempt. The county argued that the plaintiff's action was barred because it raised "a question of valuation which should have been presented to the board of equalization [as a prerequisite to] judicial review." (*Id*., at p. 164.)[12] The plaintiff retorted that it was not alleging an overvaluation, "but rather . . . a claim of illegality . . . *in toto* as based on an erroneous ownership — the fee interest . . . , not its revocable possessory interest in the property, a separate taxable item which was not recognized and assessed at all." (*Ibid*.)

*Parr-Richmond*, *supra*, 43 Cal.2d 157, determined that the "[p]laintiff is correct in its distinction as to the necessity for recourse to the board of equalization prior to resort to the court. Where the owner of property rights claims that the tax assessment overvalued what he owned, he may not attack the determination of a board of equalization in court unless he has fully and fairly presented the question of the value of his property to the board. [Citations.] But where the taxpayer attacks the assessment as void because he does not own the property on which the tax demand was made, there is no question of valuation which must be presented first to the board of equalization for correction as a

---

[12] The plaintiff in *Parr-Richmond*, *supra*, 43 Cal.2d 157, alleged in its complaint that it had filed petitions for cancellation of the assessments with the local board of equalization, only to have these petitions denied. Before the trial court, however, the plaintiff stipulated that these allegations regarding " 'demand and refusal' " were surplusage, and could be struck. (*Id*., at p. 164.)

21

condition for judicial relief." (*Id.*, at pp. 164-165, italics added.) *Parr-Richmond* cited *Brenner* for this proposition. (*Parr-Richmond*, at p. 165.) *Parr-Richmond* then quoted *Associated Oil*, *supra*, 4 Cal.App.2d at page 9: " 'While in one sense it is true that almost any mistake which results in an excessive assessment amounts to an overvaluation of the property of a taxpayer, we think there is a real and distinct difference between those cases in which it may properly be said that the error is one of overvaluation and those cases in which the overvaluation is a mere incidental result of an erroneous assessment of property which should not have been assessed.' " (*Parr-Richmond*, at p. 165.) "So here," the *Parr-Richmond* court concluded, "plaintiff's theory of relief — from an illegal tax because it was levied against a greater property interest than it allegedly owned . . . did not require its prior application to the board of equalization before recourse to the court." (*Ibid.*)

As was true in *Brenner*, the dispute in *Parr-Richmond* concerned a property interest that was exempt from taxation as a matter of law. Therefore, *Parr-Richmond* did not need to expand the basic principle, announced in *Brenner* and reaffirmed in *Security-First*, that the nullity exception applies in circumstances where a taxpayer claims not to own assessed property or a property interest *and* it is readily ascertainable that the property or interest lies beyond the county's legal authority to tax. When these conditions are met, a dispute will not squarely implicate the county board's valuation expertise, and the other public interests advanced by exhaustion — including the ability of the government to timely anticipate and collect revenue — would not be unduly compromised by allowing a refund action to proceed without prior exhaustion through an assessment appeal. By comparison, a simple disclaimer of ownership of properly taxable property, on its own, does not meet these criteria. Even if this property is not owned by the originally assessed party, it presumably remains taxable, and prompt resolution of

22

ownership issues through an assessment appeal will allow a county to identify the proper owner and take appropriate steps to recover the taxes that are owed.

### D. Subsequent Developments in the Law

Moreover, subsequent developments in the law have undermined the notion that an assertion of nonownership of nonexempt assessed property provides a sufficient basis on its own for avoiding the statutory assessment appeal process. On this point, we observe at the outset that in the few instances where this court has revisited the nullity exception since *Parr-Richmond* was decided, we have not specifically identified, even in dicta, a bald disavowal of ownership of assessed property as an independent ground for invoking the nullity exception. In *Star-Kist Foods, Inc. v. Quinn* (1960) 54 Cal.2d 507 (*Star-Kist*), we explained that "[p]rior application to the local board of equalization has not been required . . . in certain cases where the facts were undisputed and the property assessed was tax-exempt [citations], outside the jurisdiction [citation], or nonexistent [citations]." (*Id*., at p. 510.) Our description in *Stenocord*, *supra*, 2 Cal.3d 984, of situations implicating the nullity exception, though exemplary, also did not include claims of nonownership. (*Id*., at p. 987.)

Furthermore, our intervening decisions construing the nullity exception have established that invocation of this exception is inappropriate in situations where an administrative appeal could eliminate the need for subsequent court proceedings by clarifying the facts underlying a dispute. *Star-Kist*, *supra*, 54 Cal.2d 507, excused the plaintiff's failure to bring an administrative assessment appeal on the ground that the sole issue pressed by the plaintiff was that a tax statute was "unconstitutional on its face," and "[a]s in cases involving only the question whether property is taxable, there is no question of valuation that the local board of equalization had special competence to decide. There is no dispute

23

as to the facts and no possibility that action by the board might avoid the necessity of deciding the constitutional issue or modify its nature." (*Id*., at p. 511.) A decade later, however, *Stenocord*, *supra*, 2 Cal.3d 984, clarified that this "unconstitutional on its face" exception is limited, and subject to prudential considerations. *Stenocord* observed that "[i]f any question of valuation exists, it would be irrelevant that plaintiff also challenges the assessment as 'arbitrary' or void on constitutional grounds. [Citations.] If prior recourse to the board on the question of valuation might have avoided the necessity of deciding the constitutional issue, or modified its nature, plaintiff's action was properly dismissed." (*Id*., at p. 988.) Here, the parties and their supporting amici curiae dispute whether plaintiff's contentions of nonownership present "any question of valuation." Nevertheless, *Stenocord*'s *rationale* for requiring exhaustion unquestionably applies — the County's assessment appeals board was and is capable of resolving disputed issues of ownership, and the resolution of this issue could have eliminated the need for a refund action in the courts.

Reforms to the assessment appeal process since *Parr-Richmond* was decided also establish that today, a simple claim of nonownership of nonexempt property does not provide a sufficient basis for invoking the nullity exception. As discussed *ante*, statutory adjustments to and clarifications of the assessment appeal process, and in particular the addition of the stipulation procedure found at section 5142, subdivision (b), are inconsistent with the position that a naked claim of nonownership of assessed property provides a sufficient basis for avoiding exhaustion through a timely assessment appeal. Meanwhile, other changes in the law have made the assessment appeal process a more effective remedy than it had been at the time *Parr-Richmond* was decided, and in doing so have weakened the case for applying the nullity exception in a situation such as this one.

24

When this court decided *Parr-Richmond*, the assessment appeal process was informal and incorporated few features conducive to the development of a robust record. Prior to 1962, county boards of supervisors performed the function of local boards of equalization. (See Early, *Local Equalization Practice in California* (1964) 4 Santa Clara Law. 147, 147.) As so constituted, these boards were sometimes criticized as having insufficient time and expertise to competently address assessment issues. (*Id*., at p. 163; see also Ehrman, *Administrative Appeal and Judicial Review of Property Tax Assessments in Cal. — The New Look* (1970) 22 Hastings L.J. 1, 13 (*Administrative Appeal*).) Meanwhile, the limited ability of taxpayers to develop a record before the county board made it difficult to effectively challenge assessments through the appeal process. Few tools existed to aid the taxpayer in mounting such a challenge, and some important information could be difficult to obtain. For example, prior to 1961, a statute directed that "information and records in the assessor's office which are not required by law to be kept or prepared by the assessor are not public documents and shall not be open to public inspection." (Former § 408, added by Stats. 1941, ch. 604, p. 2051.) Describing these limitations on a taxpayer's ability to challenge an assessment, one commentator observed that "[b]efore 1967" a taxpayer "could not obtain meaningful information from the assessor as to the basis of the assessment and therefore had no handle for an attack." (*Administrative Appeal*, *supra*, 22 Hastings L.J. at p. 7.)

In the 1960s, however, the Legislature took substantial steps to make the assessment appeal process a more effective mechanism for challenging an assessment, and to improve the ability of a taxpayer to develop an administrative record that could usefully inform subsequent judicial proceedings. In 1962 and 1966, the state Constitution was amended to allow counties to create special appointive appeals boards to hear taxpayer protests of their property tax

25

assessments.  (*Administrative Appeal*, *supra*, 22 Hastings L.J. at p. 13; see Cal. Const., art. XIII, § 16 ["[t]he county board of supervisors, or one or more assessment appeals boards created by the county board of supervisors, shall constitute the county board of equalization for a county"].)  In 1961, the Legislature amended the statutory disclosure rule to provide that "[t]he assessor shall permit an assessee of property to inspect at the assessor's office any information and records, whether or not required to be kept or prepared by the assessor, relating to the appraisal and the assessment of his property, except information and records which also relate to the property or business affairs of a person other than the assessee."  (§ 408, subd. (b), as added by Stats. 1961, ch. 1076, § 1, p. 2809.)  Other changes to the assessment appeal process entitled a party to demand written findings of fact from the board, and imposed requirements that assessment appeal proceedings be transcribed and a copy of the transcript be provided to the taxpayer upon request.  (§ 1605, as amended by Stats. 1966, 1st Ex. Sess. 1966, ch. 147x, § 71, p. 672.)  These and other related reforms were described as amounting to a "procedural revolution," with the effect that "for the first time in the state's history, a California taxpayer's representative can invoke laws that guarantee him access to and the time to gather the information he needs to prepare a case, prescribe a specified standard for assessment, provide a means to more expertise on the part of reviewing authorities, and expand the scope of judicial review."  (*Administrative Appeal*, *supra*, 22 Hastings L.J. at p. 2.)[13]

_____

[13]    More recent reforms to the assessment appeal process include the recognition of a "rebuttable presumption affecting the burden of proof in favor of the taxpayer or assessee who has supplied all information as required by law to the assessor in any administrative hearing involving the imposition of a tax on an owner-occupied single-family dwelling, the assessment of an owner-occupied single-family dwelling pursuant to this division, or the appeal of an escape assessment" (§ 167, subd. (a)), except "in the case of an administrative hearing

*(Footnote continued on next page.)*

In light of these developments, to the extent that *Parr-Richmond*, *supra*, 43 Cal.2d 157, regarded the nullity exception as applicable to basic claims of nonownership of nonexempt assessed property, ample reason exists to revisit this view. Back in 1954, *Parr-Richmond* may have regarded assessment appeal proceedings before a board of equalization, when a claim of nonownership was involved, as having little value in advancing the purposes served by the exhaustion rule. But it is apparent that such proceedings before a county board can serve useful purposes today. And, as discussed, we regard *Parr-Richmond*'s extension of the nullity rule as inconsistent with modern manifestations of legislative intent to channel disputes such as the one involved here toward county boards for initial review. We therefore overrule *Parr-Richmond Industrial Corp. v. Boyd*, *supra*, 43 Cal.2d 157, to the extent that it extended the nullity exception to situations where the sole basis for invoking the exception is an assertion of nonownership of nonexempt property.

### E. Prospective Application

Nevertheless, we recognize that a taxpayer in plaintiff's position might have reasonably relied on our decision in *Parr-Richmond* to believe it was unnecessary to timely exhaust its administrative remedies through the assessment appeal process before filing a tax refund claim and bringing a refund action pressing a claim of nonownership of the assessed property. For this reason, we conclude that our holding should apply only prospectively.

---

*(Footnote continued from previous page.)*

with respect to the appeal of an escape assessment resulting from a taxpayer's failure either to file with the assessor a change in ownership statement or a business property statement, or to obtain a permit for new construction" (*id*., subd. (b)).

27

" 'Although as a general rule judicial decisions are to be given retroactive effect [citation], there is a recognized exception when a judicial decision changes a settled rule on which the parties below have relied.  [Citations.]  "[C]onsiderations of fairness and public policy may require that a decision be given only prospective application.  [Citations.]  Particular considerations relevant to the retroactivity determination include the reasonableness of the parties' reliance on the former rule, the nature of the change as substantive or procedural, retroactivity's effect on the administration of justice, and the purposes to be served by the new rule." ' " (*Claxton v. Waters* (2004) 34 Cal.4th 367, 378-379.)

We believe that the present circumstances bring this case within the exception to the general rule.  The language in *Parr-Richmond* was unequivocal, lending itself to reasonable reliance by plaintiff and others in its position.  Refusing to apply *Parr-Richmond* here, therefore, "would unfairly undermine the reasonable reliance of parties on the previously existing state of the law." (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 983.)  Furthermore, "[l]imiting the retroactivity of our decision is also indicated by the nature of the change effected by the new rule. . . .  Prospective application will not remove any substantive defense to which defendants would otherwise be entitled.  Retroactive application of the change, on the other hand, would bar plaintiffs' actions regardless of their merits.  Retroactive application of an unforeseeable procedural change is disfavored when such application would deprive a litigant of 'any remedy whatsoever.'  [Citations.]" (*Woods v. Young* (1991) 53 Cal.3d 315, 330.)  In subsequent proceedings before the superior court, the County remains free to argue that plaintiff did in fact have a sufficient taxable connection to the assessed property at the relevant times.  These facts "draw [this case] apart from the usual run of cases," making prospective-only application of our holding proper. (*Newman*, 48 Cal.3d at p. 983.)

28

**F. Statute of Limitations**

Finally, the County argues that plaintiff's action is barred by the statute of limitations because plaintiff did not file its refund claim within three years of submitting its applications for cancellation of assessments to the clerk of the board of supervisors on June 13, 2007. The County's argument derives from section 5097, subdivision (a)(3)(A)(ii), which provides that a plaintiff has one year to file a tax refund claim, running from "the expiration of the [two-year] time period specified in subdivision (c) of Section 1604 if the county assessment appeals board fails to hear evidence and fails to make a final determination on the application for reduction in assessment or on the application for equalization of an escape assessment of the property." The County regards this language as pertinent here, so that plaintiff had until June 13, 2010 (one year after the close of the two-year period) to pay the taxes and file its refund claim, making its 2012 filing untimely.

The fatal flaw in this argument is that section 5097, subdivision (a)(3)(A)(ii) contemplates the prior filing of an application for assessment reduction under section 1603. Here, plaintiff never filed such an application. Instead, plaintiff attempted to file applications to *cancel* the assessments under section 4986, and as we have determined, plaintiff reasonably relied on our *Parr-Richmond* precedent in opting not to pursue a reduction in assessment through an administrative appeal. Thus, the County cannot now persuasively assert that the 2007 filing implicates the limitations period set forth in section 5097, subdivision (a)(3)(A)(ii).

29

### III. CONCLUSION

Henceforth, a claim of nonownership of nonexempt assessed property, by itself, will not provide a sufficient basis for invoking the nullity exception and thereby avoiding the assessment appeal process when a taxpayer seeks a reduction in an assessment on the local roll. We overrule our decision in *Parr-Richmond Industrial Corp. v. Boyd*, *supra*, 43 Cal.2d 157, insofar as it related a contrary rule. But because our holding operates only prospectively, we affirm the judgment of the Court of Appeal, and remand this matter for further proceedings consistent with this opinion.

**CANTIL-SAKAUYE, C. J.**


**WE CONCUR:**

**WERDEGAR, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

30

**CONCURRING AND DISSENTING OPINION BY CHIN, J.**


The majority emphasizes the benefits of administrative exhaustion, making statements of policy that I embrace in principle but find to be irrelevant to the matter before us. (Maj. opn., *ante*, pp. 6–7, 13–14, 16–17, 23–24, *passim*.) This case is not about whether a taxpayer bringing a refund action under Revenue and Taxation Code[1] section 5140 must exhaust administrative remedies. Rather, it is about whether such a taxpayer must pursue a specific avenue of exhaustion that, by its own terms, does not apply to the type of claim plaintiff is making.

Section 5142 states the administrative prerequisites that apply to tax refund actions. Subdivision (a) provides in relevant part: "No action shall be commenced or maintained under this article [commencing with section 5140] . . . unless a claim for refund has first been filed pursuant to Article 1 (commencing with Section 5096)." Section 5096 authorizes the administrative refund of taxes that are "[e]rroneously or illegally collected" or "[i]llegally assessed or levied," and section 5097 provides that taxes cannot be refunded except "on a claim[] [¶] . . . [v]erified by the person who paid the tax, his or her guardian, executor, or administrator." The claim must be "in writing," and it must specify "[t]he grounds on which the claim is founded." (§ 5097.02.) In limited situations (including

---

**1** All further undesignated statutory citations are to the Revenue and Taxation Code.

1

corrections of errors on the tax roll as to amount, cancellations of taxes after payment, and assessment reductions after a hearing), the tax collector or the auditor can refund taxes (§ 5097.2), but otherwise refund claims are decided by the board of supervisors (see §§ 5099, 5140, and 5141). The board of supervisors is of course empowered to hold a hearing, subpoena witnesses, and make findings of fact, to the extent it deems those steps appropriate. (Gov. Code, §§ 25170, 25207.) Thus, a refund claim is, by itself, a fully adequate avenue of administrative exhaustion, affording a full evidentiary hearing when one is deemed necessary to resolve factual issues.[2] The majority is simply wrong to the extent its conclusions are driven by the perceived need to provide an "adequate" (maj. opn., *ante*, pp. 5, 16; see *id*., pp. 23–27) means of administrative exhaustion.

Plaintiff here alleges that as of the lien date it did not own the property being taxed and had no other obligation to pay taxes on the property. (See § 405, subd. (a).) The majority does not dispute that plaintiff filed the requisite claim for

[2] Although a refund claim is, by itself, a fully adequate administrative remedy, I do not contend that a refund claim is the only administrative remedy that a taxpayer must exhaust. To the extent the statutory scheme makes other nonduplicative administrative remedies available, and to the extent the taxpayer knows or should know of its claim during the relevant time frame, the taxpayer must exhaust those other remedies, too. (See *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080 ["In general, a party must exhaust administrative remedies before resorting to the courts" and "an administrative remedy is exhausted only upon 'termination of all available, nonduplicative administrative review procedures.' "].) For example, a taxpayer who hopes to prosecute a refund action under section 5140 arguing that the assessment was too high must first apply to the county board for an assessment reduction under section 1603 before paying the disputed tax and filing a refund claim. Similarly, a taxpayer who hopes to prosecute a refund action under section 5140 arguing that the tax was in error or illegal, and who knows of the error or illegality at the time the tax is levied, must first apply to the auditor for cancellation under section 4986 before paying the disputed tax and filing a refund claim.

a refund under section 5097, and that the claim met the requirements of section 5097.02. The majority insists, however, that before filing a refund claim, a taxpayer denying ownership must file an assessment reduction application under section 1603. Not so.

Section 1603, subdivision (a) provides in relevant part: "A *reduction in an assessment* on the local roll shall not be made unless the party affected or his or her agent makes and files with the county board a verified, written application showing the facts claimed to require the reduction and the applicant's opinion of the full value of the property." (Italics added.) Thus, an assessment reduction application under section 1603 is, by its terms, a precondition to the county board *reducing the amount of an assessment* on the local assessment roll, which occurs during the period when the board is equalizing the assessment roll before the tax is levied. Section 1603 does not state that it is a precondition of any other type of decision or action a county might make with respect to the payment or refund of taxes. It may be that the vast majority of claims that taxpayers bring before the county seek to reduce the assessment amount, and therefore counties may be accustomed to such claims, but if a taxpayer is not seeking to reduce the amount of the assessment, section 1603 places no limitation on the county's ability to provide the taxpayer a remedy, and nothing in the statutory text obligates the taxpayer to proceed under section 1603.[3] The majority has no response to this textual

---

[3]     Defendant argues that, irrespective of how plaintiff has pleaded its claim, the claim is really an assessment reduction claim. Defendant points out that in assessing plaintiff's personal property, it bundled that property and assessed it as a whole. Plaintiff seeks to unbundle the assessment, arguing that on the relevant lien dates, it did not own most of the personal property that defendant assessed, but because plaintiff admits to owning at least some of that property, it has been asking defendant to *reduce* the overall assessment. Defendant argues that because plaintiff seeks to reduce the overall assessment, its claim is really an assessment

*(Footnote continued on next page.)*

3

argument.  In fact, the majority misunderstands what an "assessment reduction" is.
A bit of statutory history will help to elucidate the point.

---

*(Footnote continued from previous page.)*

reduction claim that needed to be brought in the first instance before the local
board by way of an application under section 1603.

Defendant's argument is not persuasive.  Defendant is correct that a single
bundled assessment of all personal property is permitted (§ 602, subds. (d) & (i);
*El Tejon Cattle Co. v. County of San Diego* (1967) 252 Cal.App.2d 449, 459), but
a county cannot, by bundling various items of personal property that a taxpayer
does *not* own with other items that the taxpayer owns, force the taxpayer to bring a
nonownership claim by way of a section 1603 application.  As this court said in
*Parr–Richmond,* " '[w]e think there is a real and distinct difference between those
cases in which it may properly be said that the error is one of overvaluation and
those cases in which the overvaluation is a mere incidental result of an erroneous
assessment of property which should not have been assessed.' " (*Parr–Richmond
Industrial Corp. v. Boyd* (1954) 43 Cal.2d 157, 165 (*Parr–Richmond*); see
*Lockheed Aircraft Corp. v. County of L.A.* (1962) 207 Cal.App.2d 119, 124, 127
[county assessed personal property as a bundle; taxpayer claimed that, as of lien
date, some property had been sold; taxpayer brought refund action without first
applying to county board for assessment reduction; court permitted judicial inquiry
into whether county had assessed property not subject to taxation; "Where, as
here, the assessor lumps in a single entry, 'Personal Property $22,640,370,'
judicial review would be unnecessarily restricted if the court could not inquire as
to what property the assessor intended to include."].)  For the contrary rule,
defendant relies on *El Tejon Cattle Co.*, *supra*, 252 Cal.App.2d 449, but that case
is easily distinguished because it involved numerous units of property having the
same generic character (see *id*. at p. 456), and the dispute was over the number of
such units.  Thus, it was a valuation case.

Defendant also argues that plaintiff's action is barred by the statute of
limitations (see § 5097, subd. (a)(3)(A)(ii)) because plaintiff did not file its refund
claim within three years of its belated filing of applications for assessment
reductions under section 1603.  Defendant is referring to the time when plaintiff
submitted applications to the county board asking to cancel the disputed
assessments under section 4986.  (See maj. opn., *ante*, p. 4.)  The obvious problem
with this argument is that plaintiff never filed applications for assessment
reductions under section 1603, and plaintiff had no obligation to do so.

4

In 1939, the Legislature enacted the Revenue and Taxation Code, incorporating into that code various tax provisions from the Political Code. What is now section 1603 of the Revenue and Taxation Code was enacted in 1939 as section 1607. (Stats. 1939, ch. 154, § 1607, p. 1302.) At that time, the assessor had to complete the local assessment roll by the first Monday in July of each year (*id*., § 616, p. 1293), and the board of supervisors, sitting as a board of equalization, had until the third Monday in July (two weeks later) to equalize the assessments on the roll (*id*., § 1603, p. 1302). Equalization is a process whereby assessments on the roll are reduced or increased to comply with section 401's requirement that property be assessed at value, which in 1939 was defined, more or less, as market value (Stats. 1939, ch. 154, § 110, p. 1277). (See *Eastern– Columbia, Inc. v. Los Angeles County* (1943) 61 Cal.App.2d 734, 743 ["The purpose of the board of equalization is to see that all properties in the county are 'equalized'; that is to say that the assessor appraise all properties in the county at a constant level of opinion as to market value and keep all properties in their proper relationship one to the other."].) In 1939, former section 1607 merely provided that the county board could not reduce an assessment unless an interested party filed an application with the board, showing facts in support of the reduction. (Stats. 1939, ch. 154, § 1607, p. 1302.) Its placement among the statutory provisions dealing with the equalization process confirms that it had to do with assessment amounts and nothing else. County boards could increase assessment amounts on their own initiative, but they could not reduce assessment amounts without an application under former section 1607.

In 1939, former section 1607 did not contain any time limitation, but as a practical matter, the application for an assessment reduction had to be filed during the two-week period between the completion of the assessment roll by the assessor and the county board's deadline for equalizing the assessments, because three days

5

after that deadline, the clerk of the county board had to deliver the "corrected local roll" to the auditor. (Stats. 1939, ch. 154, § 1614, p. 1303.) The *state* Board of Equalization then met until the third Monday in August (a month later), providing intercounty equalization of the assessment roll (*id*., § 1831, p. 1305), after which the tax was levied (*id*., §§ 2151, 2152, p. 1307) and sections 4986 and 5096 came into play.

When enacted, former section 4986 empowered the board of supervisors to cancel an *uncollected* tax if it was levied "[e]rroneously or illegally" (Stats. 1939, ch. 154, § 4986(b), p. 1366), and former section 5096 empowered the board of supervisors to refund a *collected* tax if it was "[e]rroneously or illegally collected" (Stats. 1939, ch. 154, § 5096(b), p. 1370).

Thus, the statutory scheme envisioned at least three forms of administrative relief that a taxpayer might pursue at distinct stages in the process, each applicable to the issues under consideration at the stage in question: During the equalization of the assessment roll before the tax was levied, the taxpayer could apply for an assessment reduction, challenging the assessment amount as stated on the roll (former § 1607). After the tax was levied, but before it was collected, the taxpayer could apply for cancellation of the tax (former § 4986).[4] And if those two

---

[4] The statutory scheme does not make any express provision for the filing of an application under section 4986, but decisions dating back to the 1930s hold that, at least in the case of a party claiming to be tax exempt, section 4986 is not self-executing and the tax-exempt party must apply before a tax can be cancelled. (*City of Pasadena v. Chamberlain* (1934) 1 Cal.App.2d 125, 133–134 [construing the predecessor section to section 4986; holding that the provision allowing for the cancellation of a tax when the property is sold to a tax-exempt party after the tax lien date is not self-executing].) Also, section 4986 has, since 1941, required "satisfactory proof" (§ 4986, subd. (a)), which implies a contested proceeding initiated by an interested party. Finally, section 4986 has, since 2004, referred to the "initiat[ion]" of a "cancellation action" (§ 4986, subd. (c)), again implying a

*(Footnote continued on next page.)*

6

alternative remedies were inadequate to resolve the claim, then after collection of the tax, the taxpayer could seek a refund of the payment (former § 5097). Thus, it appears that former section 4986 (followed, if necessary, by a refund claim under former §§ 5096 & 5097) was intended as the avenue of administrative exhaustion for taxpayer claims alleging errors or other issues that did not call into question the amount of the assessment, whereas former section 1607 (again followed, if necessary, by a refund claim under former §§ 5096 & 5097) was intended for taxpayer claims disputing the assessment amount. (See *Montgomery Ward & Co. v. Welch* (1936) 17 Cal.App.2d 127, 131 ["In the case of an erroneous or illegal assessment the board of supervisors may refund [under former § 5096] the amount paid under protest or cancel the entire assessment under [former § 4986, but] . . . in cases of mere overvaluation of property, relief is to be obtained by making timely objection [under former § 1607] before the board of supervisors sitting as a board of equalization."].)

Several changes in the law were made in 1966. For example, the voters adopted a constitutional amendment that year, authorizing counties to create specialized assessment appeals boards to equalize the assessment roll, and most

---

*(Footnote continued from previous page.)*

contested proceeding. Thus, it is clear that a taxpayer must invoke section 4986 by applying for cancellation.

It is not clear, however, whether a taxpayer can apply for cancellation of an uncollected tax *after delinquency*. In my view, a taxpayer cannot. If a taxpayer could allow a tax to become delinquent and then bring a cancellation application without having to pay the tax, the taxpayer could delay indefinitely without concern for the rapidly accumulating, nonrefundable penalties that apply to the redemption of property after tax default (see § 4103). Rather, the statutory scheme has always contemplated that once a tax becomes delinquent, the taxpayer is obligated to pay it (along with all applicable penalties) before seeking administrative relief.

counties have done so.[5]  (Cal. Const., art. XIII, § 16.)  These assessment appeals boards must be comprised of members who have relevant professional experience (such as experience in property appraisal, since the valuation of property is the essence of the equalization process).  (§§ 1624, 1624.05.)  The creation of the assessment appeals boards relieved the burden on the boards of supervisors as regards a type of taxpayer claim that was particularly common (assessment reduction claims), but it did not imply that application to the board of supervisors for resolution of other types of claims was somehow an inadequate administrative remedy.  Moreover, because these assessment appeals boards were created by a constitutional amendment that transferred governmental authority previously granted only to the boards of supervisors, the assessment appeals boards only have the power that the state Constitution grants to them, which is the power to "equalize the values of all property on the local assessment roll by adjusting individual assessments."  (Cal. Const., art. XIII, § 16.)  Thus, the majority, by expanding the authority of the assessment appeals boards to hear nonownership claims, not just equalization claims, ignores the express constitutional constraints placed by the voters on such boards.  If the voters had wanted to transfer nonownership claims to the assessment appeals boards, it could have done so, but it did not.  (See *ibid*.)  The majority has no answer for how either the Legislature or this court can expand the jurisdiction of the assessment appeals boards to cover claims that do not relate to assessment amount.

Also in 1966, the Revenue and Taxation Code was amended so that the county boards no longer had to complete the work of equalizing assessments by the third Monday in July; instead, they could "continue in session . . . , from time

---

[5]     In referring in this opinion to the "county board," I mean either the local board of equalization or the local assessment appeals board, as the case may be.

8

to time, until the business of equalization is disposed of." (§ 1603, as amended by Stats. 1966, ch. 147, § 70, p. 671.)  And with that amendment, former section 1607 was also amended to require that applications for assessment reduction be filed by September 15.  (Stats. 1966, ch. 147, § 72, p. 672.)  The latter deadline has been revised several times in subsequent enactments, and in 1974, former section 1607 was renumbered as section 1603 (Stats. 1974, ch. 180, § 13, p. 359), but former section 1607 (now § 1603) has always been directed to the equalization process, and more particularly to reduction in the amount of the assessment.

The deadline for filing an assessment reduction application was added in 1966 because of the decision to relieve the county boards of the obligation of completing the equalization process within two weeks.  In the absence of that two-week limitation, an end date was needed for the filing of assessment reduction applications.  There is no reason, however, for the deadline governing assessment reduction applications to also govern other claims a taxpayer might raise, since assessment reduction is related to the equalization process, which occurs *before* the tax is levied, whereas other taxpayer claims will arise (or ripen) *after* the tax is levied.[6]  But contrary to the view expressed by the majority (maj. opn., *ante*, pp. 13–14, 19, 22–23), taxpayer claims that do not relate to the assessment amount are still governed by appropriate time constraints, as I discuss in more detail below. (See pp. 20-24, *post*.)

In 1970, section 4986 was amended to permit the cancellation of *collected* taxes as well as uncollected taxes.  (Stats. 1970, ch. 129, § 3, p. 357.)  With that

---

**6** It merits noting that the expedited timeline that governs assessment reduction applications is also warranted because such proceedings often concern questions of market valuation, and market conditions can change rapidly.  Other types of taxpayer claims are not necessarily subject to the same urgency.

change, the line began to blur between section 4986 applications (which were originally pre-collection proceedings) and section 5097 refund claims (which are post-collection proceedings). As a result of the 1970 amendment, these two forms of administrative exhaustion now overlap to some extent, allowing a taxpayer that *has paid* a tax to bring a cancellation application in addition to a refund claim. In 2004, section 4986 was further amended to add subdivision (c), providing that if the tax is collected more than four years after enrollment of the tax bill, cancellation of the tax is permitted so long as the cancellation action is initiated within 120 days of the payment of the tax. Thus, subdivision (c) expressly permits cancellation and refund of an erroneously collected tax *after* the close of the four-year period for correcting the tax roll (see §§ 51.5, subd. (b), 4831, subd. (a)(1)).[7]

Section 1603 (former § 1607) remains today in Part 3 of the Revenue and Taxation Code, dealing with the equalization of the assessment roll. As noted, it provides that no "*reduction* in an assessment" shall be made in the absence of an application. (§ 1603, subd. (a), italics added.) It is important to recognize that the jurisdiction of the county boards is constitutionally limited to "adjusting individual assessments" (i.e., reducing or increasing them) (Cal. Const., art. XIII, § 16), and that the remedy of reducing the assessment simply does not apply when, as here, the taxpayer asserts that it does not own the property in question and that it has no legal obligation to pay taxes on the property. When the wrong person or entity has been named as assessee (see § 405, subd. (a)), reducing the assessment amount — even reducing it to zero — will do nothing to correct the error that the assessor has

---

[7]    It is my view that such a cancellation action must relate to a claim of error that could not have been brought prior to the tax becoming delinquent. In other words, subdivision (c) does not revive a section 4986 cancellation claim that the taxpayer could have, and should have, brought when the tax was first levied. (See pp. 2, fn. 2, 6, fn. 4, *ante*.)

10

made, because even after reduction of the assessment amount to zero, the wrong person or entity will remain listed on the assessment roll as the assessee, thus violating section 405, and there will then be the additional error that the reduced assessment amount no longer reflects the property's "full value" as is required by section 401.**8** Thus, when the wrong person or entity has been assessed, the appropriate remedy is not to *reduce* the assessment amount, but rather to assess the *right* person or entity, while keeping the assessment amount unchanged. For this reason, it simply makes no sense for a taxpayer claiming nonownership to apply under section 1603 for a "*reduction* in [the] assessment." (Italics added.) The taxpayer might as well apply for violation of sections 401 and 405. The majority, by arguing that section 1603 applies to nonownership claims like that of plaintiff, only betrays a fundamental misunderstanding of what assessment reduction is and what the county boards are constitutionally empowered to do.

Not surprisingly, the foregoing understanding of assessment reduction applications was adopted by this court in *Parr–Richmond*, *supra*, 43 Cal.2d at page 165. There, as here, the taxpayer asserted that it was not the owner of the property being taxed. Specifically, the taxpayer in *Parr–Richmond* was in the

---

**8**      Even if the term "reduction" might be read to encompass requests to reduce the assessment to zero, and thus to effectively cancel the assessment, that reading is foreclosed by the procedure specified in section 1603 for making the request for a reduction: The taxpayer is required to "show[] the facts claimed to require the reduction and *the applicant's opinion of the full value of the property*." (§ 1603, subd. (a), italics added.) The latter requirement makes no sense in the context of a taxpayer that denies ownership of the property: Why would a taxpayer be required to opine on the full value of property it claims not to own, and how would such a taxpayer know the property's full value? The majority attempts to answer these questions (see maj. opn., *ante*, pp. 14–15), but the simplest and most persuasive inference is that section 1603 is not designed as a vehicle for challenges based on nonownership, but is instead directed at claims for the reduction of the assessment amount.

11

process of purchasing the property, but as of the lien date, the change in ownership had not become final, and the taxpayer held only a revocable possessory interest in the property. (*Id*. at p. 163.) Thus, the situation presented in *Parr–Richmond* was very much like the situation presented here — a taxpayer challenging a tax assessment, arguing that it was not the owner of the property being taxed. This court concluded that, under those circumstances, applying to the county board for an assessment reduction under the predecessor statute to section 1603 was *not* required. The court said: "[W]here the taxpayer attacks the assessment as void because he does not own the property on which the tax demand was made, there is no question of valuation which must be presented first to the board of equalization for correction as a condition for judicial relief." (*Parr–Richmond*, at p. 165.)[9]

*Parr–Richmond* was thoroughly supported by the text of the statute it interpreted, and it was in full harmony with the surrounding statutory scheme. Moreover, it built on a line of decisions dating back to 1911, holding that application to the county board of equalization is not necessary where the assessment amount is not in dispute, and where it is argued instead that the property does not exist or is tax exempt. (See *Associated Oil Co. v. County of Orange* (1935) 4 Cal.App.2d 5; *Brenner v. Los Angeles* (1911) 160 Cal. 72

---

[9]     *Parr–Richmond* held only that there was no valuation question that needed to be presented by way of an application under former section 1607 (now § 1603). This court did not hold that the taxpayer's ownership dispute did not otherwise need to be presented to the county for adjudication. Indeed, in *Parr–Richmond*, this court noted that the taxpayer had unsuccessfully petitioned the board for cancellation of the assessment (*Parr–Richmond*, *supra*, 43 Cal.2d at p. 164), and therefore the county in that case could not argue that the taxpayer had neglected to bring its claim before the board. Rather, it was limited to arguing that the taxpayer's claim had to be brought by way of an assessment reduction application under former section 1607 (now § 1603). It was only that narrower argument that our opinion rejected.

(*Brenner*).)  Thus, *Parr–Richmond* was a quite unremarkable decision, and in the more than 60 years that have transpired since this court issued it, there has been neither an outcry from the counties, nor a legislative effort to abrogate its holding. The majority imagines that *Parr–Richmond* has led to problems that need to be resolved by overturning that decision (maj. opn., *ante*, pp. 13–14, 16–17, 23–27), but it has not.

The majority argues that the 1993 addition of subdivision (b) to section 5142 (see Stats. 1993, ch. 387, § 8, p. 2218) broadened the scope of section 1603. It asserts that while section 1603 may, at one time, have been limited to disputes over assessment amount (see *Parr–Richmond*, *supra*, 43 Cal.2d at p. 165), with the addition of subdivision (b) to section 5142, the law *now* requires that nonvaluation issues, including plaintiff's nonownership claim, be presented to the county board by way of a section 1603 application.  (See maj. opn., *ante*, pp. 10–13, 24.)  The majority argues, in other words, that the Legislature implicitly abrogated the holding of *Parr–Richmond* when it added subdivision (b) to section 5142.  Obviously, if the Legislature had done so intentionally, we would expect to find some mention of it in the relevant legislative history.  There is none.  So instead, the majority argues that even though the Legislature may not have enacted section 5142, subdivision (b) with *Parr–Richmond* specifically in mind, the enactment of section 5142, subdivision (b) — as well as other amendments related to the assessment reduction scheme — changed the statutory landscape, and under that changed landscape, *Parr–Richmond*'s holding is no longer valid.  (See maj. opn., *ante*, pp. 23–27.)

Section 5142, subdivision (b) provides that the requirement of filing a section 1603 application can be satisfied by the filing of a simple stipulation

13

stating that valuation issues are not in dispute.[10]  The majority reasons that because section 5142, subdivision (b) allows parties to stipulate that the dispute involves "nonvaluation issues," it implicitly expands section 1603, sweeping within its scope *all* claims a taxpayer might bring, even ones, like plaintiff's nonownership claim, that do not relate to assessment reduction.  The majority argues that otherwise the stipulation provision would be surplusage.  (Maj. opn., *ante*, pp. 12–13.)[11]

There are two problems with this approach.  First, the majority never explains how the Legislature could broaden the jurisdiction of the county boards, whose constitutional authority is limited to "equaliz[ing] the values of all property on the local assessment roll by adjusting individual assessments" (i.e., by reducing or increasing them).  (Cal. Const., art. XIII, § 16.)  Second, the majority

[10]  Section 5142, subdivision (b) states:  "When the person affected or his or her agent and the assessor stipulate that an application involves only nonvaluation issues, they may file a stipulation with the county board of equalization stating that issues in dispute do not involve valuation questions.  To the extent possible, the stipulation shall also indicate the parties' agreement as to the assessment amounts that would result under their respective positions on the issue or issues in dispute.  The board shall accept or reject the stipulation, with or without conducting a hearing on the stipulation.  The filing of, and the acceptance by the board of, a stipulation shall be deemed compliance with the requirement that the person affected file and prosecute an application for reduction under Chapter 1 (commencing with Section 1601) of Part 3 in order to exhaust administrative remedies.  However, the filing of, and the acceptance by the board of, a stipulation under this subdivision shall not excuse or waive the requirement of a timely filing of a claim for refund."

[11]  The majority ignores the fact that section 1603 is worded as a constraint on the power of county government to act.  (§ 1603, subd. (a) ["A reduction in an assessment . . . shall not be made unless the party affected . . . makes and files with the county board a verified, written application . . . ."].)  By concluding that section 5142, subdivision (b) implicitly expands section 1603, sweeping within its scope claims that do not relate to assessment reduction, the majority greatly limits the power of counties to act on their own motion to correct errors on the tax roll.

14

misunderstands section 5142, subdivision (b)'s use of the phrase "nonvaluation issues," reading that phrase as referring to disputes that are not assessment reduction disputes, and thus as an expansion of board authority, rather than reading it as a description of a *particular subset* of assessment reduction disputes.

Section 1603 has always dealt with *assessment* reductions, not *valuation* reductions. When *Parr–Richmond* was decided, this point was, as a practical matter, a distinction without a difference, since property in California was assessed in proportion to market value. Therefore, *Parr–Richmond* used the term "valuation" as if it were synonymous with "assessment." Today, property is still assessed in a one-to-one ratio with "full value" (§ 401), but as a result of the approval of Proposition 13 on June 6, 1978, full value is not always the same as market value (§§ 110.1, 110.5; Cal. Const., art. XIII A, § 2), and therefore assessment amounts no longer move in lockstep with market valuation. Hence, when section 5142, subdivision (b) refers to the subset of section 1603 applications that involve "nonvaluation issues," it is not implying that section 1603 is no longer limited to assessment reduction claims, and that despite its express language and the applicable constitutional constraints (Cal. Const., art. XIII, § 16), it now covers all taxpayer claims. Rather, section 1603 continues to apply only to assessment reduction claims, as the plain language of that section makes clear, and the purpose of section 5142, subdivision (b)'s reference to "nonvaluation issues" is to single out those assessment reduction claims that relate to the county's right under Proposition 13 to reappraise the property, while excluding those claims that relate to market valuation.

As most people in California are aware, Proposition 13 amended the Constitution to limit the ad valorem tax on real property to 1 percent of "full cash value," and to define "full cash value" as "the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred" (Cal.

15

Const., art. XIII A, §§ 1, 2), with a separate provision permitting annual inflation-based increases not exceeding 2 percent (*id.*, § 2, subd. (b)). Because of Proposition 13, there are now situations when a very significant increase in the market value of real property is not disputed, but the taxpayer nonetheless seeks a "reduction in [the] assessment" under section 1603, because the taxpayer claims the county had no right under Proposition 13 to reappraise the property. It is *those assessment reduction claims* that section 5142, subdivision (b) was enacted to address. It should not be read as broadening section 1603 to include claims that do not concern assessment reduction, thus contradicting section 1603's plain language and the state Constitution. In other words, section 5142, subdivision (b)'s reference to "nonvaluation issues" does not refer to *any* nonvaluation issue that a taxpayer might raise; rather, it refers to the subset of assessment reduction issues that, because of Proposition 13, do not turn on market valuation.

When it is understood that the purpose of section 5142, subdivision (b) was to create an administrative mechanism for adjudicating Proposition 13 reappraisal disputes, it becomes apparent that the addition of subdivision (b) in 1993 cannot be analyzed in isolation from the Legislature's consideration in 1992 of a bill that would have allowed taxpayers to bypass the county board when raising Proposition 13 change-in-ownership disputes.

By way of background, section 1605.5, subdivision (a) provides that the county board "shall hear" disputes concerning whether a change-in-ownership has occurred for purposes of reappraisal under Proposition 13. In 1992, the Legislature considered a bill that would have permitted taxpayers, at their option, to bring such change-in-ownership disputes by way of a refund claim under section 5097 without needing first to apply for an assessment reduction under section 1603. (Sen. Bill No. 1557 (1991–1992 Reg. Sess.) as introduced Feb. 18, 1992, §§ 5, 8.) The 1992 bill was proposed in recognition of the fact that county

16

boards deal with valuation questions, not legal questions. (See Sen. Com. on Rev. & Tax., Analysis of Sen. Bill No. 1557 (1991–1992 Reg. Sess.) Apr. 8, 1992, p. 4 ["change-[in]-ownership issues, often being issues of law, are not appropriately handled by assessment appeals boards"].) The counties, however, opposed the bill, arguing that the bill would give taxpayers an unfair procedural advantage. (*Id*. at p. 5.)

A year later, section 5142, subdivision (b) was added to the Revenue and Taxation Code. (Stats. 1993, ch. 387, § 8, p. 2218.) In light of its focus on those assessment reduction claims that do not involve valuation issues — in other words, those that relate to the county's right under Proposition 13 to reappraise the property — it seems apparent that section 5142, subdivision (b) was a renewed attempt to solve the problem that the 1992 bill addressed. Significantly, section 5142, subdivision (b) achieves the same end that the 1992 bill would have achieved (allowing change-in-ownership disputes to be brought as § 5097 refund claims), but it does so only when the county stipulates that the assessment reduction that the taxpayer is seeking does not turn on valuation (and when the county board accepts the stipulation). In other words, section 5142, subdivision (b) answers the concern the counties had regarding the procedural one-sidedness of the 1992 bill.

The legislative history thus reveals that section 5142, subdivision (b) impacts only the subset of assessment reduction disputes that concern the county's right under Proposition 13 to reappraise the property. To suggest that section 5142, subdivision (b) broadens section 1603 applications to include claims that do not relate in any way to assessment reduction is a gross misreading. This point is confirmed by the fact that the same bill that enacted section 5142, subdivision (b) also added subdivision (b) to section 1605.5. (Stats. 1993, ch. 387, § 5, pp. 2216–2217.) Section 1605.5, subdivision (b) requires disputes concerning certain types

17

of penalties to be brought by way of a section 1603 application. If, as the majority argues, section 5142, subdivision (b) was designed to broaden section 1603 applications to include all nonvaluation issues that a taxpayer might raise, then section 1605.5, subdivision (b) would have been unnecessary. As important, section 1605.5, subdivision (b) makes plain that had the Legislature intended to broaden section 1603 applications to include claims that do not relate to assessment reduction, it knew how to do so.

Likewise, the provision of section 5142, subdivision (b) stating that the parties should, "[t]o the extent possible," agree as to the "*assessment* amounts that would result under their respective positions" (italics added) shows that the focus of section 5142, subdivision (b) is assessment reduction under section 1603, and that issues that do not involve assessment reduction do not fall under section 5142, subdivision (b).

The majority uses this provision of section 5142, subdivision (b) in a different way. It notes that a taxpayer bringing a section 1603 application must opine as to the property's value (see § 1603, subd. (a); see also p. 11, fn. 8, *ante*), and it concedes that a taxpayer that does not own the taxed property might have difficulty doing so. The majority then draws a comparison to section 5142, subdivision (b)'s statement that the parties filing a stipulation under that subdivision should, "[t]o the extent possible," agree as to the "assessment amounts that would result under their respective positions," and the majority concludes that a similar allowance applies to a section 1603 applicant's obligation to give an opinion as to the taxed property's value: The applicant need only do so to the extent possible. (See maj. opn., *ante*, p. 15.)

The majority thus conflates the reference to "value" in section 1603, subdivision (a) with the reference to "assessment amount" in section 5142, subdivision (b). But when parties stipulate under section 5142, subdivision (b),

18

they are certainly *not* being asked to agree as to the "*valuation* amounts that would result under their respective positions," because by the very terms of the stipulation, valuation is not being disputed. Rather, the parties are being asked to agree as to the "*assessment* amounts that would result under their respective positions" (§ 5142, subd. (b), italics added), because the "assessment amounts" are what they are fighting about. This natural reading further confirms that the subject of section 5142, subdivision (b) is the assessment amount, that section 5142, subdivision (b) refers only to "nonvaluation issues" that arise in disputes over assessment amount, and that section 1603 is not an avenue for other types of claims that a taxpayer may raise.

Furthermore, as already discussed, the statutory scheme includes an alternative mechanism designed to allow a taxpayer to raise claims that are unrelated to assessment amount. Specifically, before a tax becomes delinquent, a taxpayer can apply to the auditor for cancellation of an erroneously or illegally levied tax under section 4986, and if that application is unsuccessful, the taxpayer can pay the tax and bring a refund claim under section 5097.[12] This alternative avenue of administrative exhaustion is a fully "adequate" (maj. opn., *ante*, pp. 5, 16), affording the county an opportunity to hold an evidentiary hearing when appropriate. Moreover, it is better suited than section 1603 to taxpayer claims that are unrelated to assessment amount. For example, because such claims do not concern equalization, there is no need for such claims to proceed along the

---

[12] If the taxpayer knows, or should know, of the claim at the time the tax is levied, he or she is obligated, in my view, to bring a section 4986 cancellation application before the tax becomes delinquent. (See pp. 2, fn. 2, 6, fn. 4, *ante*.) In other cases, the taxpayer can apply for cancellation after paying the tax. Note that as a result of the 1970 amendment, section 4986 extends to cancellation of *collected* taxes. (Stats. 1970, ch. 129, § 3, p. 357.)

timeline that applies to the equalization process.  Most important, this alternative remedy avoids expanding the jurisdiction of the county boards beyond their constitutional limit.  (See Cal. Const., art. XIII, § 16.)

A taxpayer like plaintiff that denies ownership of the taxed property can ask the auditor to cancel the tax under section 4986 immediately after the tax is levied, asserting that the tax is erroneous.  Thus, the taxpayer can promptly bring the error to the county's attention, and, assuming the taxpayer has a valid argument, the matter can be efficiently resolved before the tax becomes payable, leaving the county ample time to assess the correct party.[13]  And if that remedy fails, the taxpayer can pay the tax and bring a refund claim.  When one considers the limits the state Constitution places on the jurisdiction of the county boards and also the text, history, and general structure of the Revenue and Taxation Code, it is clear that this alternative remedy is intended for the administrative adjudication of taxpayer claims that are unrelated to assessment reduction, and that section 1603 is intended only for the administrative adjudication of assessment reduction claims.

The majority argues, however, that no suitable time constraints apply to claims under section 4986 and 5097, and therefore that the expansion of section

---

[13]    The majority distinguishes *Brenner*, *supra*, 160 Cal. 72, reasoning that the property at issue in *Brenner* was tax exempt.  Here, by contrast, if plaintiff had proceeded under section 1603 and promptly established that it was not the owner of the farm equipment, then county officials could have identified the correct owner and made an escape assessment naming that owner.  (See maj. opn., *ante*, pp. 19 and 22–23.)

For the reasons stated in the main text, I disagree that a section 1603 application is the only way of ensuring that nonownership claims will be promptly brought to the attention of county officials.  Moreover, the majority overlooks the likelihood that the actual owner of the farm equipment reported the equipment on its tax statements, as is required by law (see §§ 441, 442, 445, and 461), and that the equipment was therefore already assessed and taxed.  In that case, taxing plaintiff will result in the farm equipment being taxed twice.

20

1603 to cover all taxpayer claims is necessary — despite the limits placed by the state Constitution, the plain meaning of the statute's text, and longstanding precedent — because a timeline governs section 1603 claims. (See maj. opn., *ante*, pp. 13–14, 19, 22–23.) The majority is concerned about the superior courts being burdened by stale nonownership claims that lack a developed administrative record. (See *id*., pp. 14 and 23–27.) This concern, however, is purely theoretical; it does not stand up to scrutiny.

The absence of an administrative record in a particular case that might come before the superior court is not the fault of some failing in the statutory scheme, which, as noted, permits boards of supervisors to hold full evidentiary hearings when deciding nonownership claims. Rather, it is the fault of the county that does not take advantage of the administrative process that the statutory scheme offers. Here, for example, the parties asserted at oral argument that in the County of Fresno (County), administrative review of section 5097 refund claims tends to be relatively perfunctory in practice. That may be true in the typical case involving a dispute over the amount of an assessment, because such a dispute must be initiated by way of a section 1603 application, and when the same matter is later raised by way of a section 5097 refund claim,[14] it has already been adjudicated by the county board (§ 5097, subds. (a)(3) and (b)). There is no reason, however, why review of a section 5097 refund claim needs to be perfunctory if the claim raises a nonownership issue, and plaintiff here cannot be blamed if the County did not choose to provide the full hearing that the statutory scheme permits.

---

**14** At the taxpayer's option, a section 1603 application can itself serve as a section 5097 refund claim. (§ 5097, subd. (b).)

As for the question of stale claims coming before the courts, the time limitations that apply to a tax refund actions are set forth in section 5141, which states in relevant part: "An action brought under this article [governing tax refund actions] . . . shall be commenced within six months from and after the date that the board of supervisors or city council rejects a [section 5097] claim for refund in whole or in part." (§ 5141, subd. (a).) Section 5097 provides in relevant part: "An order for a refund under this article [governing tax refunds] shall not be made, except on a claim: [¶] . . . [¶] . . . filed within four years after making the payment sought to be refunded . . . ." (§ 5097, subd. (a).)[15] Thus, a taxpayer must bring a refund claim within *four years* of making the disputed tax payment, and the taxpayer must sue in superior court within *six months* of the refund claim being denied by the board of supervisors. It is true that a refund claim may be brought even after payment of a delinquent tax (§§ 5096, 5097), and therefore it is conceivable that a taxpayer will allow a tax to be delinquent for many years, and then pay the tax and bring a refund claim. That possibility is one that the Legislature expressly built into the statutory scheme. But the statutory scheme also serves to limit the presentation of stale claims. Delinquency penalties are set at 10 percent of the tax (§§ 2617, 2618, 2704, 2705, 2922) and after default on July 1 (§ 3436), redemption penalties on real property begin to accumulate at a

---

[15] Paragraph (3) of subdivision (a) of section 5097, which was omitted from the quotation in the main text above, sets forth a shorter limitations period that applies to refund claims when the taxpayer has applied under section 1603 for an assessment reduction (and such applications are themselves subject to a short limitations period (see §§ 1603, subds. (b)–(d), 1605, subds. (b), (c), & (e))). It is, of course, my view that the limitation period set forth in paragraph (3) does not apply when, as here, the taxpayer is not seeking an assessment reduction, for then the taxpayer does not need to proceed under section 1603.

rate of 18 percent per year (§ 4103). Such penalties operate in practice to minimize delay on the part of the taxpayer.

Moreover, tax assessments are based, in most cases, on self-reporting by the taxpayer (§§ 441, 442, 445, 461 [requiring taxpayers to report personal property, and imposing criminal penalties for willful falsehoods]; 480, 480.1, 480.2, 482 [requiring taxpayers to report changes in ownership or control of real property, and imposing penalties for failure to do so]), and strong incentives also encourage property owners to record real property conveyances (see Civ. Code, § 1214). Thus, when a taxpayer is named on the assessment roll as the assessee, it is, generally speaking, because the taxpayer reported to the county that it was the person or entity obligated to pay the taxes on the property in question, and in the case of real property, the conveyance of the property to the taxpayer is, generally speaking, a matter of public record that can be easily verified. As a result, nonownership claims are most likely to arise, in practice, in situations like the one here, where a county audits a taxpayer, concludes that the taxpayer owns personal property that the taxpayer failed to report, and makes an escape assessment under section 531. In such a case, the taxpayer is given notice of the audit results, and the taxpayer will consequently know that the escape assessment relates to items of property that the taxpayer claims not to own. Therefore, under normal circumstances, the taxpayer who intends to dispute the assessment can apply for cancellation under section 4986 as soon as the escape assessment is made, presenting its proof of nonownership. As noted, it is my view that a taxpayer that denies ownership of taxed property and that knows of its claim at the time the tax

is levied is obligated to apply for cancellation *before* the disputed tax becomes delinquent (see pp. 2, fn. 2, 6, fn. 4, *ante*).**16**

Accordingly, the superior courts are not now overwhelmed with stale nonownership claims, nor will they be if we reaffirm our longstanding holding that taxpayer claims that are unrelated to assessment amount need not be brought by way of assessment reduction applications under section 1603. The majority articulates problems that simply do not exist, and then uses these hypothetical problems to overturn a 60-year-old precedent that reflects the constitutional imperative, that is in complete harmony with the statutory text, and that the Legislature has not viewed as problematic. More than 60 years ago, *Parr– Richmond* reached the unremarkable conclusion that section 1603 assessment reduction applications have to do with assessment reduction, not denials of ownership, and there is absolutely no crisis requiring us to jury-rig the statutory language to permit a new approach.

The statutory scheme contemplates the use of section 1603 applications followed by section 5097 refund claims to obtain administrative review of assessment reduction claims, and it contemplates the use of section 4986 applications followed by section 5097 refund claims to obtain administrative review of other types of taxpayer claims, and both avenues of administrative

---

**16** Here, plaintiff submitted applications for cancellation of the relevant assessments, and the County returned them unfiled. (See maj. opn., *ante*, p. 4.) Therefore, the County cannot argue that plaintiff was obligated to file such applications but failed to do so. Although plaintiff did not file these applications before the disputed taxes became delinquent, the County also cannot argue that the applications were filed late. From the outset, the County has litigated this case on the theory that plaintiff failed to file timely applications for assessment reductions under section 1603, not that it failed to file timely applications for cancellation of the assessments under section 4986.

exhaustion are fully adequate, permitting counties to hold evidentiary hearings and develop the administrative record. Thus, while the majority purports to vindicate administrative exhaustion, it ignores the avenue of administrative exhaustion that the Legislature has designated for the type of claim plaintiff is raising, instead forcing that claim into an avenue of administrative exhaustion that, by its own terms and by longstanding precedent, does not apply.

For that reason, I dissent from the views expressed by the majority, although I concur in the judgment because the majority applies its holding prospectively only.

CHIN, J.

**I CONCUR:**

**CORRIGAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Williams & Fickett v. County of Fresno
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 232 Cal.App.4th 1250
**Rehearing Granted**

_____

**Opinion No.** S224476
**Date Filed:** June 5, 2017
_____

**Court:** Superior
**County:** Fresno
**Judge:** Donald S. Black

_____

**Counsel:**

Dowling Aaron Incorporated, Lynne Thaxter Brown and Ronald A. Henderson for Plaintiff and Appellant.

Daniel C. Cederborg, County Counsel, Michal R. Linden and Peter Wall, Deputy County Counsel, for Defendant and Respondent.

Mary C. Wickham, Interim County Counsel (Los Angeles) and Albert Ramseyer, Principal Deputy County Counsel, for California State Association of Counties as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Ronald A. Henderson
Dowling Aaron Incorporated
8080 N. Palm Avenue, Third Floor
P.O. Box 28902
Fresno, CA  93729-8902
(559) 432-4500

Peter Wall
Deputy County Counsel
2220 Tulare Street, Suite 500
Fresno, CA  93721-2128
(559) 600-3479